# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6733 | **DATE** | 7/13/2001 |
| **CASE TITLE** | Knoll Pharmaceutical Co. vs. Automobile Insurance Co. of Hartford | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for judgment on the pleadings [23-1] is granted in part. Defendant Automobile Insurance Co. of Hartford's motion for judgment on the pleadings [343-1], Defendant National Union Fire Insurance Co. of Pittsburgh, PA's motion for judgment on the pleadings [33-1] and Royal Insurance Co. of America's motion for judgment on the pleadings [27-1] are all denied. Defendant Insurers' briefs on the transferability issue are due on or before July 27, 2001. Plaintiff's response is due on or before August 10, 2001. The Court will rule by mail.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **4** | **Document Number** |
| | No notices required. | | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | | JUL 16 2001 | 60 |
| | Notified counsel by telephone. | | | | date docketed | |
| | Docketing to mail notices. | | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | 7/13/2001 | |
| | Copy to judge/magistrate judge. | | FB-7 FILED FOR DOCKETING | | date mailed notice | |
| RO | courtroom deputy's initials | | 01 JUL 13 AM 9: 51 | | RO | |
| | | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KNOLL PHARMACEUTICAL CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00 C 6733 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| AUTOMOBILE INSURANCE | ) | |
| CO. OF HARTFORD, NATIONAL | ) | |
| UNION FIRE INSURANCE CO. OF | ) | |
| PITTSBURGH, PA and ROYAL | ) | |
| INSURANCE CO. OF AMERICA, | ) | |
| | ) | JUL 1 6 2001 |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Knoll Pharmaceutical Company ("Knoll") filed this diversity lawsuit, seeking a

declaration that Automobile Insurance Company of Hartford ("Automobile"), National Union

Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") and Royal Insurance

Company of America ("Royal") (collectively "Defendant Insurers") owed a duty to defend Knoll

in the underlying case, *In re Synthroid Marketing Litigation,* 110 F. Supp. 2d 676 (N.D. Ill.

2000). Currently before this Court are Knoll's and Defendant Insurers' motions for judgment on

the pleadings. Knoll's motion is partially granted, (R. 23-1), and all of Defendant Insurers'

motions for judgment on the pleadings are denied (R. 27-1, 33-1, 34-1).

## RELEVANT FACTS

Defendant Insurers issued the policies in question to Boots Pharmaceuticals, Inc., a

wholly-owned subsidiary of Boots (USA). In 1995, BASF acquired Boots (USA) and, in

connection with that acquisition, Boots Pharmaceuticals changed its name to Knoll

Pharmaceutical Co. Knoll claims relief under these policies as successor-in-interest to Boots.

Defendant Insurers deny that the policies have transferred to Knoll.

Boots manufactured, marketed and sold a prescription drug known as Synthroid. Synthroid, a synthetic form of a thyroid hormone (levothyroxine sodium), is used to treat certain thyroid diseases and cancer. Levothyroxine sodium (LT4) medications are narrow therapeutic index drugs: slight over- or under-dosing can cause serious medical problems. Beginning in 1986, various companies have claimed their LT4 medications are Synthroid's bioequivalents – drugs capable of being freely interchanged without altering their therapeutic effects. When bioequivalents exist, doctors may prescribe these other brand names or generic versions to their patients at lower prices.

## I. The Underlying Synthroid Marketing Actions

Certain consumers and third-party payors filed more than seventy lawsuits, most as class actions, against Knoll and other defendants regarding the sale and marketing of Synthroid. These actions were transferred to the United States District Court for the Northern District of Illinois, as part of a Multi-District Litigation ("MDL") proceeding called *In re Synthroid Marketing Litigation. See* 110 F. Supp. 2d 676. In the Master Consumer Class Action Complaint ("MCCAC"), the underlying plaintiffs were consumers who purchased Synthroid beginning January 1, 1990. In the Master Third-Party Payor Class Action Complaint ("TPPCAC"), the underlying plaintiffs were payors of health and medical services and supplies, including government agencies, who allegedly paid excessive costs for Synthroid medication on behalf of their insureds. These complaints contain allegations that the insured "concealed or suppressed information about cheaper bioequivalent drugs, falsely represented that there were no equivalents, and charged individual consumers and their insurers more than they would have been able to if the correct information had been known, in violation of federal antitrust and

2

racketeering laws and state fraud statutes." *Id.* at 679.

According to the MCCAC, by fraudulently concealing information proving that bioequivalents to Synthroid exist and by misrepresenting that Synthroid is superior to other LT4 drugs, Knoll, Boots and BASF "have successfully controlled the levothyroxine market, persuaded physicians to specify Synthroid in their levothyroxine prescriptions, and thus required the millions of persons afflicted with hypothyroidism and other thyroid diseases to purchase Synthroid instead of the less expensive, bioequivalent brand name and generic levothyroxine drugs." (R. 1-1, Compl. Ex. 9, MCCAC ¶ 1.) According to Knoll, the Food and Drug Administration ("FDA") has not determined that all LT4 products are bioequivalent. (*Id.*, Compl. ¶ 7.)

Knoll's complaint highlights the allegations in the underlying litigation reflecting Boots' advertisements. These advertisements claimed that "[t]here is no substitute for Synthroid," that there was "[n]o proven bioequivalent product," and that "[n]o adequate and well-controlled studies have demonstrated bioequivalence among levothyroxine sodium products." (*Id.*, Compl. ¶ 20.) Knoll also focuses on allegations claiming that Boots published certain letters and articles disparaging a scientist, Dr. Betty Dong, whose University of California at San Francisco study suggested the existence of bioequivalents for Synthroid. (*Id.*, Compl. ¶ 22.) In their answers and briefs, Defendant Insurers emphasize the allegations against Boots for antitrust activities, consumer fraud, unfair competition, negligent misrepresentation and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Moreover, the underlying allegations do not claim Boots slandered, libeled or disparaged any of the consumers' or third party payors' goods or reputations.

## II. Defendant Insurers' Policies

Boots tendered the original underlying complaint to Defendant Insurers for a defense in 1997. All Defendant Insurers refused the tender, denying they had a duty to defend Knoll under the insurance policies in question.

Automobile issued Boots three commercial general liability ("CGL") policies effective from April 1, 1989 to April 1, 1992. Royal issued Boots a CGL policy effective from April 1, 1992 to September 30, 1993. National Union issued Boots two CGL polices effective from September 30, 1993 to December 1, 1995. All of the insurers have issued policies containing identical language.[1] (*Id.*, Compl. Exs. 3-5, Def. Insurers' Policies.) The language order is negligibly different on Automobile's policies covering April 1, 1989 to April 1, 1991. (*Id.*, Compl. Exs. 1-2, Def. Auto.'s Policies.) All of the policies define both "advertising injury" and "personal injury" as injury "arising out of" several offenses including, *inter alia*, "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (*Id.*, Compl. Exs. 1-5, Def. Insurers' Policies.) Each policy also contains a section stating that the insured's "rights and duties under this policy may not be transferred without our written consent except in the case of death of an

---

[1]
> 1. Insuring Agreement
>    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. . . .
>    This insurance applies to:
>    1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;
>    2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;
>    but only if the offense was committed in the "coverage territory" during the policy period.

individually named insured." (*Id.*)

On October 27, 2000, Knoll filed a three-count complaint in this Court seeking: (1) a declaratory judgment that Defendant Insurers had a duty to defend Knoll in the underlying Synthroid litigation; (2) a finding that each Defendant Insurer's refusal to defend Knoll against the underlying complaint breached its respective insurance policies requiring each defendant to defend and indemnify on behalf of Knoll all liabilities, losses, costs and expenses incurred in the underlying litigation; and (3) attorneys' fees and additional amounts recoverable pursuant to § 155 of the Illinois Insurance Code. Knoll claims that Defendant Insurers' policies' advertising and personal injury provisions activated defense obligations. Presently before the Court are the parties' cross-motions for judgment on the pleadings filed pursuant to Federal Rule of Civil Procedure 12(c). For the following reasons, we partially grant Knoll's motion for judgment on the pleadings. Furthermore, we deny Automobile's, National Union's and Royal's motions for judgment on the pleadings.

## LEGAL STANDARD

A party can move for judgment based on the pleadings alone. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). Rule 12(c) provides the standard to be applied on a motion for judgment on the pleadings:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(c). In this case, the parties have not presented material outside of the pleadings. Therefore, this motion for judgment on the pleadings is subject to the same standards

as a Rule 12(b)(6) motion to dismiss: all well-pleaded facts are taken as true, all inferences are drawn in favor of the nonmovant and all ambiguities are resolved in favor of the nonmovant. *Alexander v. City of Chicago,* 994 F.2d 333, 335 (7th Cir. 1993). Thus, a "motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law." *Nat'l Fid. Life Ins. Co. v. Karaganis,* 811 F.2d 357, 358 (7th Cir. 1987).

## ANALYSIS

### I. Choice of Law

As a preliminary matter, we must resolve a conflict of laws. *W. Am. Ins. Co. v. Moonlight Design, Inc.,* 95 F. Supp. 2d 838, 841 (N.D. Ill. 2000). Federal courts sitting in diversity consider conflict of law issues when the parties disagree on which state's law applies, *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.,* 136 F.3d 1116, 1120 (7th Cir. 1998), and where state law differences affect the outcome of the case, *Centennial Ins. Co. v. Transitall Servs. Inc.,* 2001 WL 289879, at *2 n.1 (N.D. Ill. Mar. 15, 2001). This includes situations where one party argues that one state's law governs and the other does not address the issue, but relies on another state's law in its briefs. *Mass. Bay Ins. Co.,* 136 F.3d at 1121. We apply the conflict of law rules of the forum state to determine the applicable substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (U.S. 1941). As this suit was filed in Illinois, Illinois' choice of law rules will govern. *Jupiter Aluminum Corp. v. Home Ins. Co.,* 225 F.3d 868, 873 (7th Cir. 2000).

Knoll and Defendant Insurers disagree as to which state's law governs this suit. Knoll does not address this issue in detail, but relies mostly on Illinois case law in its briefs. Defendant Insurers assert that Louisiana law should apply because Boots was located in Louisiana and the

policies were delivered to Boots in Louisiana. Moreover, although the parties agree that Illinois and Louisiana law do not vary significantly on the duty to defend, Defendant Insurers indicate a substantive difference in that Louisiana law does not recognize penalty-based estoppel. Because Knoll's estoppel argument may become relevant in the future, we evaluate the choice of law issue at this time.

In Illinois, an express choice of law clause in an insurance policy would determine which state's law to apply. *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995). Lacking that, the following factors are controlling: "location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract."[2] *Id.* The *Lapham-Hickey* Court found that Illinois law applied in that case because the policy was delivered in Illinois, the plaintiff was an Illinois corporation and the defendant insurance company was licensed to do business in Illinois. *Id.*

The insurance policies in question here do not have express choice of law clauses. Therefore, we will apply the *Lapham-Hickey* test. Royal argues that Louisiana law should apply because Boots is located in Louisiana and the policies were delivered to Boots in Louisiana. As twenty-three of twenty-eight of the insured locations identified in the policy were located in Louisiana, Royal also claims that the insured risk was primarily located in Louisiana. We

---

[2] Defendant Insurers urge reliance on *U.S. Fire Insurance Co. v. Beltmann North American Co.*, 883 F.2d 564, 566 (7th Cir. 1989), and claim that this case dictates the choice of Louisiana law for determining the existence of coverage but Illinois law for determining the elements of the offenses involved. However, *Beltmann* misstates the Illinois choice of law test, limiting it to a single factor: the state where the policy was issued. *Id.* The Illinois Supreme Court has clearly confirmed the use of the multi-factor test as laid out in *Lapham-Hickey*. 655 N.E.2d at 845. Therefore, we apply the *Lapham-Hickey* Court's test to our analysis of the instant choice of law issue.

7

disagree. The majority of the factors indicate that Illinois law is the proper choice of law.

First, the location of the subject matter of these policies cannot be limited to Boots' physical locations. The policies provide a defense for Boots wherever its advertising or other oral or written statements result in litigation against it. No Defendant Insurer has asserted that Boots' advertising was limited to Louisiana.[3] Moreover, even if physical location did pertain to the subject matter of the contract, Royal's assertion that twenty-three of twenty-eight insured locations being in Louisiana is misleading. Of these twenty-three locations, seventeen refer to a single location, the Belmont Grove Addition, which appears to consist mostly of vacant land. (R. 1-1, Compl. Ex. 4, Def. Royal's Ins. Policy.) Five more refer to the same Wilderness Street address. (*Id.*) One is located at Ellerby Road. (*Id.*) That Boots had three different locations listed in Louisiana and only one in Illinois is not determinative as to a choice of law in favor of Louisiana. Before consolidation into class action complaints, Boots faced suits in a number of states. (*Id.*, Compl. Ex. 7, List of Underlying Synthroid Actions.) Subsequently, these complaints were consolidated into a MDL filed in the Northern District of Illinois. (*Id.*, Compl. Exs. 9-10, MCCAC & TPPCAC.) Moreover, the MCCAC asserts that Boots' principal place of business was Illinois. (*Id.*, Compl. Ex. 9, MCCAC ¶ 17.) Therefore, the first factor – the location of the subject matter – points to the states where Boots advertised or to Illinois as the locations where it could be sued.

Second, Royal is domiciled in Illinois. Though the other companies are citizens of various states, all are licensed to do business in Illinois.[4] Third, as the location of the insurers

---

[3] This fact distinguishes this case from *Zurich Insurance Co. v. Sunclipse, Inc.*, 85 F. Supp. 2d 842 (N.D. Ill. 2000), on which Royal relies. The policy in the *Zurich* case covered liability arising from the insured's commercial activity, which was confined to California. *Id.* at 849.
[4] Automobile is a Connecticut corporation with its principal place of business in Connecticut. National Union is a Pennsylvania corporation with its principal place of business in New York.

indicates the last act giving rise to a valid contract, *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 103 (7th Cir. 1996), for Royal that could be either Illinois, where it is incorporated, or North Carolina, where its principal place of business is located. Fourth, the place of performance could refer to any state where Boots advertised or issued oral or written statements. The location of the underlying litigation favors application of Illinois law. The MDL against Knoll was filed in Illinois Federal Court. (R. 1-1, Compl. Exs. 9-10, MCCAC & TPPCAC.) Though the court issuing the settlement agreement declined to make a choice of law determination pursuant to the state fraud claims, the choices included Illinois, New Jersey or California law, but not Louisiana law. *In re Synthroid Mktg. Litig.*, 110 F. Supp. 2d at 681. Moreover, the settlement agreement found in the final order and judgment for the underlying litigation states that "[t]his Stipulation, its Exhibits and ancillary agreements shall be governed by and interpreted according to the substantive law of the State of Illinois, without regard to its choice of law or conflict of law principles." *In re Synthroid Mktg. Litig.*, No. 97-C-6017 (N.D. Ill. Sept. 7, 2000). As such, Illinois is the state bearing a rational relationship to the general contract. Therefore, because Boots had a location in Illinois, one Defendant Insurer is located in Illinois, all of Defendant Insurers are licensed to do business in Illinois, the underlying litigation was brought in Illinois and the other factors inconclusively point to various states, we conclude that Illinois law governs this case.

## II. Motions for Judgment on the Pleadings

As discussed below, Knoll's motion for judgment on the pleadings is partially granted and Defendant Insurers' motions are denied because the contract language is ambiguous, the allegations in the underlying complaint fit at least one of the torts covered by Defendant Insurers' policies and the injury arose out of Boots' advertising or business activities. We also find that

the issue regarding the transfer of the insurance policies from Boots to Knoll requires further briefing before we can adjudicate those matters.

### A. Ambiguous Policy Language

First, we must evaluate the language of the policies in question. In order to determine an insurer's duty to defend, the court compares the allegations in the underlying complaint with the coverage provisions in the policy. *Cincinnati Cos. v. W. Am. Ins. Co.*, 701 N.E.2d 499, 502 (Ill. 1998); *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993). If the underlying complaint alleges facts that fall within, or even *potentially within*, the coverage outlined in the relevant policy, the insurer owes a duty to defend. *Cincinnati,* 701 N.E.2d at 502. Moreover, the determinative factor is not the legal label characterizing the underlying allegations, but rather, whether the alleged conduct arguably falls within at least one of the categories of wrongdoing listed in the policy. *Winklevoss Consultants, Inc. v. Fed. Ins. Co.*, 991 F. Supp. 1024, 1030 (N.D. Ill. 1998) ("*Winklevoss II*"). In construing an insurance policy, the court should strive to enforce the agreement intended by the parties. *Crum & Forster,* 620 N.E.2d at 1078. The court must also consider the contract as a whole, giving words their ordinary, plain meaning. *Id.* Furthermore, the court must construe the underlying complaint liberally and resolve all doubts in favor of the insured. *U.S. Fire Ins. Co. v. Aetna Life & Cas.*, 684 N.E.2d 956, 961 (Ill. App. Ct. 1997).

The policies at issue provide coverage for advertising and personal injuries "arising out of" certain offenses including "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (R. 1-1, Compl. Exs. 3-5, Def. Insurers' Policies.) Knoll's primary argument is that such language does not restrict coverage to slander, libel or disparagement *of the underlying plaintiff.*

10

Therefore, the policies are ambiguous as to who must be directly injured by the offenses covered in the policies. Such ambiguous contract language must be construed in Knoll's favor and against Defendant Insurers. Defendant Insurers, on the other hand, claim the language is clear. Defendant Insurers assert that the words "slander," "libel" and "disparagement" entail an element of reputational injury to the plaintiff or plaintiff's goods, meaning that these offenses must directly injure the underlying plaintiff to trigger a duty to defend. We agree with Knoll that the policies are ambiguous.

Where an insurance policy provision is ambiguous and subject to different interpretations, the ambiguity is to be construed in favor of the insured. *U.S. Fire Ins. Co.*, 684 N.E.2d at 961. Insurance contracts are also evaluated so that meaning and effect are given to every part of a contract. *St. Paul Fire & Marine Ins. Co. v. Frankart*, 370 N.E.2d 1058, 1061 (Ill. 1977). Furthermore, insurance contract terms are given broad, inclusive definitions under Illinois law. *See Winklevoss Consultants, Inc. v. Fed. Ins. Co.*, 11 F. Supp. 2d 995, 1000 (N.D. Ill. 1998) ("*Winklevoss III*") (finding that the parties did not intend to restrict meaning of disparagement offense to the elements of the common law tort); *W. Am. Ins. Co. v. Bedwell*, 715 N.E.2d 759, 763 (Ill. App. Ct. 1999) (citations omitted) (stating that the term "arising out of" is "broad and vague, and must be liberally construed in favor of the insured").[5]

Both Defendant Insurers' and Knoll's interpretations of the policy language are reasonable. It is clear that the policies would cover the defense of an underlying plaintiff directly libeled, slandered or disparaged by the insured during the course of the insured's advertising or business activities. But, applying the Illinois courts' definition of "arising out of," it is equally

---

[5] Defendant Insurers' reliance on *Microsoft Corp. v. Zurich American Insurance Co.*, No.C00-521P, slip op. at 9-10 (W.D. Wash. July 2, 2001) is misplaced as the Washington courts have assigned a narrower meaning to the language "arising out of" than have the Illinois courts.

clear that the coverage extends to any injuries that have their origin in the offenses enumerated in Boots' insurance policies. Construing the underlying complaint liberally, the injuries to the underlying plaintiffs may have their origin in slander, libel or disparagement by Boots and would fall within the language of the policies.

Furthermore, giving the term "arising out of" full meaning and effect, the identity of the person or organization directly slandered, libeled or disparaged must not be restricted to the class of underlying plaintiffs.[6] By employing broad definitions of the other terms in the policies issued by Defendant Insurers, an "offense" of libel, slander or disparagement may be alleged in the underlying litigation though the underlying plaintiffs are not the direct victims of the offenses. Therefore, the policy language does not entail that the insured must have slandered, libeled or disparaged the underlying plaintiffs, and, accordingly, we conclude that such language does not preclude Knoll from stating a claim that Defendant Insurers owe a duty to defend. We turn now to evaluate if the underlying plaintiffs' injuries arose out of slander, libel or disparagement through Boots' advertising or business activities.

---

[6] Defendant Insurers cite numerous cases supporting their argument that the elements of slander, libel and disparagement necessitate that the underlying plaintiff be directly injured by these torts. However, in none of these cases is the absence of direct injury to the plaintiff fatal to these claims. *See, e.g., Chi. Title & Trust Co. v. Hartford Fire Ins. Co.*, 424 F. Supp. 830, 834 (N.D. Ill. 1976) (finding no duty to defend where underlying complaint contains *"no* allegations of the elements of the torts at issue") (emphasis added); *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1253-54 (Ill. App. Ct. 1990) (finding no defamation where false statements were not published and statements affected only plaintiff's employer). Additionally, the law favoring broad, inclusive definitions frustrates Defendant Insurers' attempt to force restrictive definitions on terms like "injury" and "damages." *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1215 (Ill. 1992) (stating that the term "damages" is unambiguous, but its broad, ordinary meaning includes coverage for the costs of complying with injunctions).

## B. Connection Between the Insured's Advertising or Business Activities, Injury to the Underlying Plaintiff and the Offenses Covered by the Policies

Knoll also argues that the alleged injuries to the underlying plaintiffs arise out of slander, libel or disparagement by Boots, thereby triggering a duty to defend. Specifically, Knoll emphasizes several allegations in the underlying litigation regarding the advertising of Synthroid: (1) "Defendants advertised that Synthroid is more effective than or superior to the other drugs available to treat hypothyroidism," (R. 1-1, Compl. Ex. 9, MCCAC ¶ 79); (2) BASF, Knoll and Boots used "marketing and advertising designed to convince the public of Synthroid's greater effectiveness than other drugs available to treat hypothyroidism," (*id.* at ¶ 113); (3) "[b]y wrongly claiming that Synthroid is not bioequivalent to competing products, Defendants have disparaged the goods, services, and/or business of the makers of these other drugs," (*id.* at ¶ 127); and (4) "[a]s a direct and proximate result of Defendants' conduct, plaintiffs and members of the Class have been suffering and continue to suffer damages," (*id.* at ¶ 132). Knoll also highlights the allegation claiming that Dr. Mayor, Boots' Director of Medical Services, published an article in which he "claimed that the [Dong] study could not come to any conclusions about bioequivalency because the [Dong] study contained too many errors." (*Id.* at ¶ 67.) Finally, the TPPCAC alleges the following: "As a direct and proximate result of Defendants' orchestrated marketing plan of suppression and misrepresentations, Plaintiffs and the class members have been made to pay excessive costs for Synthroid." (*Id.*, Compl. Ex. 10, TPPCAC ¶ 6.)

Defendant Insurers counter these assertions, stating that there can be no allegations of the offenses enumerated in Defendant Insurers' policies because Boots did not libel, slander or disparage the underlying plaintiffs. Defendant Insurers attempt to discredit the suggestion that the underlying injury could have arisen from slander, libel or disparagement by demonstrating

how Knoll pieced together various portions of the underlying complaint in order to characterize the allegations as containing these offenses. Moreover, Defendant Insurers posit that the allegations do not reflect any claims for libel, slander or disparagement. Rather, they say that the underlying plaintiffs sued alleging antitrust activities, RICO violations, consumer fraud and unfair competition.

To determine whether an insurer owed a duty to defend based on coverage in a policy containing language similar to the policies in question here, this Court proposed a three-part test. *Winklevoss II*, 991 F. Supp. at 1031. Adapting that test to the instant policies yields the following: (1) the insured must have engaged in advertising or business activity; (2) the underlying complaint must contain allegations that fit one of the enumerated offenses; and (3) the underlying injury must have arisen out of an offense that the insured committed while engaging in advertising or business activity.

First, the term advertising has been defined as the widespread distribution of promotional material to the public. *Int'l Ins. Co. v. Florists' Mut. Ins. Co.*, 559 N.E.2d 7, 10 (Ill. App. Ct. 1990). Allegations from the underlying complaint stating that Boots contributed to the suppression of scientific information through marketing and advertising designed to convince the public of Synthroid's superior effectiveness show that Boots engaged in the requisite advertising activities. (R. 1-1, Compl. Ex. 9, MCCAC ¶ 113.) The MCCAC also alleges that Boots mailed deceptive advertising and promotional material about Synthroid throughout the Class Period (January 1, 1990 to October 16, 1997) as part of its scheme to defraud. (*Id.* at ¶¶ 76, 102.)[7]

---

[7] Each Defendant Insurer has issued Boots at least one policy providing coverage during these years. (R. 1-1, Compl. Exs. 1-5, Def. Insurers' Policies.)

Second, the underlying allegations fit at least one of the enumerated offenses because Illinois courts would open the class of underlying plaintiffs to those indirectly injured by the offenses listed in the policies. No Illinois court has addressed the issue of whether a duty to defend may be invoked when the insured did not directly slander, libel or disparage the underlying plaintiffs or the analogous issue of whether a non-competitor bringing suit for an unfair competition injury may invoke such a duty. Other courts, however, have held that only competitors' allegations of unfair competition invoke a duty to defend. *See, e.g., Pine Top Ins. Co. v. Pub. Util. Dist. No. 1*, 676 F. Supp. 212, 216 (E.D. Wash. 1987); *Bank of the W. v. Super. Ct. of Contra Costa County*, 833 P.2d 545, 551 (Cal. 1992); *Seaboard Sur. Co. v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 504 P.2d 1139, 1141 (Wash. 1973). But, these courts reached their decisions because they found that unfair competition referred only to the common law tort, where the plaintiff must be a competitor. *Id.* Conversely, under Illinois law, a similar offense was not restricted to the common law tort. *See Winklevoss III*, 11 F. Supp. 2d at 1000 (finding coverage for "disparagement" not restricted to its common law definition). The Illinois legislature confirmed this reading in the *Illinois Uniform Deceptive Trade Practices Act* ("the Act"). The Act has been characterized as a codification of the common law tort of unfair competition, *Mars, Inc. v. Curtiss Candy Co.*, 290 N.E.2d 701, 704 (Ill. App. Ct. 1972), and states that "[i]n order to prevail in an action under this Act, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding." 815 ILCS 510/2-12 (2000).[8]

---

[8] *Cf. Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995) (limiting unfair competition claims to competitors and supporting its decision with reference to the state's unfair trade practices law which distinguished causes of action for unfair competition that must be brought by competitors from other unfair trade practices that can be brought by

Moreover, the allegations in the underlying litigation correspond to the covered offenses.[9]

Defamation, which includes slander and libel, has been defined as words that reflect critically

upon one's integrity in her business or profession, *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714,

720 (Ill. App. Ct. 1978), and as a statement tending to cause harm to the reputation of another in

that it lowers that person in the community's eyes or deters third persons from associating with

that person, *Bryson v. News Am. Publ'n, Inc.*, 672 N.E.2d 1207, 1215 (Ill. 1996). Disparagement

has been defined as "words which criticize the quality of one's goods or services." *Crinkley*, 385

N.E.2d at 720. Consequently, allegations claiming that throughout the Class Period Boots

advertised that Synthroid is superior to all other drugs that treat thyroid problems, (R. 1-1,

Compl. Ex. 9, MCCAC ¶ 75), are disparaging in that they criticize the quality of other

companies' LT4 products as being inferior to Synthroid. In addition, such allegations are similar

to those in *Sun Electric Corp. v. St. Paul Fire & Marine Insurance Co.*, No. 94 C 5846, 1995 WL

270230 (N.D. Ill. May 4, 1995), where the underlying complaint stated that the insured claimed it

was the superior company in the industry, leading this Court to find that the insurer had a duty to

defend. 1995 WL 270230, at *15. Furthermore, allegations that Boots published articles

---

consumers).

[9] This Court has also emphasized that in determining a duty to defend, the focus is not on whether the underlying allegations support an independent theory of relief, but whether any of the allegations fall within a category of wrongdoing covered by the policy. *Winklevoss II*, 991 F. Supp. at 1030; *Sun Elec. Corp. v. St. Paul Fire & Marine Ins. Co.*, No. 94 C 5846, 1995 WL 270230, at *13 (N.D. Ill. May 4, 1995). In *Sun Electric*, a duty to defend was found to be triggered based on an underlying complaint alleging that the insured published statements indicating it was the most experienced company in the field and unequaled in the industry and that the insured disparaged the services and business of the underlying plaintiff. 1995 WL 270230, at *15. Furthermore, it was irrelevant that the allegations were not intended to prove a claim for commercial disparagement; a duty to defend existed even if only a portion of the liberally construed allegations fell within the covered provisions. *Id.* Therefore, there likely still would have been a duty to defend even if the insured had disparaged the goods and services of a party other than the underlying plaintiff.

discounting the research techniques of a scientist employed to determine if Synthroid had bioequivalents, (R. 1-1, Compl. Ex. 9, MCCAC ¶ 67), constitute defamation as such statements surely lowered Dr. Dong's reputation in the eyes of the scientific community.

As Defendant Insurers indicate, the underlying allegations do not claim recovery for slander, libel or disparagement. However, this does not preclude the existence of a duty to defend as it is the facts alleged in the underlying complaint – not the legal theory – that is controlling. *Cincinnati,* 701 N.E.2d at 502 (stating that, if the complaint alleges facts even potentially within the coverage of the policy, the duty to defend has been established). Because only a portion of the liberally construed allegations need fall within the covered provisions in order to invoke a duty to defend, *International Insurance Co. v. Rollprint Packaging Products, Inc.*, 728 N.E.2d 680, 692 (Ill. App. Ct. 2000), the allegations that Boots advertised its product as superior to all other similar products and published statements harming the reputation of Dr. Dong bring these actions within the categories of wrongdoing that the policies cover.

Third, the underlying injury arose out of an offense the insured committed while engaging in advertising or business activities. The causal connection between the insured's activities and the alleged injury is the salient factor in determining a duty to defend. *See Winklevoss III,* 11 F. Supp. 2d at 999 (stating that the majority rule requires that advertising activity cause the injury in order to trigger a duty to defend). Where there is no causal connection between the insured's advertising or other covered business activities and the injury to the underlying plaintiff, there is no duty to defend. *See, e.g., W. States Ins. Co. v. Wis. Wholesale Tire, Inc.*, 184 F.3d 699, 703 (7th Cir. 1999) (finding no duty to defend where the complaint did not seek recovery for damages arising out of insured's advertising activity); *Diamond State Ins. Co. v. Chester-Jensen Co.*, 611

N.E.2d 1083, 1088 (Ill. App. Ct. 1993) (finding no bodily injury coverage where employees' injuries were not a necessary causal link in the injury to the underlying plaintiffs).

Based on Knoll's complaint, there is a sufficient causal connection between the insured's activities and the alleged injury to the underlying plaintiffs.[10] The allegations state that Boots' misrepresentations, made in public statements and advertisements, caused damage to the underlying plaintiffs. (*Id.*, Compl. Ex. 9, MCCAC ¶ 75.) Indeed, even the judge who presided over the settlement of the underlying litigation characterized the causal chain between the "misinformation" and the higher prices as long, "but not so long that a rational jury might not accept it." *In re Synthroid Mktg. Litig.*, 110 F. Supp. 2d at 681.

In sum, Knoll has established that Boots advertised during the policy periods, that the allegations correspond to the covered offenses and that the underlying injury arose out of the covered offenses. Therefore, we find that Defendant Insurers owed a duty to defend.[11]

## C. Transfer of the Policies from Boots to Knoll

We find that further briefing is needed before we can adjudicate whether the insurance

---

[10] Defendant Insurers rely on *QSP, Inc. v. Aetna Casualty & Surety Co.*, 256 Conn. 343, 357 (Conn. 2001), to claim that where the underlying plaintiff did not allege direct injury via the torts enumerated in the policy there can be no duty to defend. This overstates the holding of the case and fails to account for the differences between *QSP* and the instant case. Significantly, the *QSP* Court found no evidence that the insureds conducted a derogatory advertising campaign. *Id.* at 367. Moreover, while the *QSP* Court does consider the identity of the underlying plaintiff as a significant factor, it also finds controlling the existence of a causal relationship between the covered offense and the plaintiff's injury. 256 Conn. at 355. In evaluating the duty to defend, the court notes that the underlying plaintiffs were not the proper parties, but ultimately concludes that because "there was no causal relationship between the [underlying plaintiffs'] injuries and the torts that [the insured] claim caused those injuries, there is no duty to defend." *Id.* at 355, 382. Thus, even in the *QSP* case the causal connection is the salient factor.

[11] Given our conclusion that there is a duty to defend, there is no need to address Knoll's estoppel argument at this time. However, Defendant Insurers should be aware that based on the finding of such a duty, Knoll will remain free to re-raise the estoppel argument in the future.

policies transferred from Boots to Knoll. As this request will elicit matters outside the pleadings, we will treat this motion as one for summary judgment. *N. Ind. Gun & Outdoor Shows, Inc.*, 163 F.3d at 453 (stating that when matters outside of the pleadings are not excluded from its consideration, the court should convert the Rule 12(c) motion into a Rule 56 motion for summary judgment). Specifically, we wish to know from Defendant Insurers the remaining questions of material fact that preclude judgment in favor of Knoll and, in particular, if any such questions may require an evidentiary hearing.

Briefly, Knoll asserts that the insurance policies have transferred from Boots to Knoll as a matter of law. Defendant Insurers deny that the policies transferred to Knoll because of policy language stating that a transfer of rights under the policy requires written consent. (R. 1-1, Compl. Exs. 3-5, Def. Insurers' Policies.)

Determining if the insurance policies have transferred from Boots to Knoll is a novel issue under Illinois law. However, the following cases suggest that at a minimum, we will need to evaluate the details of the corporate merger and acquisition between Boots, Knoll and BASF. In Illinois, a corporation which merges with another corporation assumes the obligations and liabilities of the latter corporation. *Myers v. Putzmeister, Inc.*, 596 N.E.2d 754, 755 (Ill. App. Ct. 1992). A successor corporation which buys the assets of another corporation, however, is not liable for the debts of the seller unless dictated by an express agreement.[12] *Id.* Certain courts have found that a company which purchased the assets and liabilities of a predecessor entity may

---

[12] The exceptions to this non-liability rule are: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation." *Id.* at 756.

not recover under the insurance policy of the original entity as the successor company did not pay premiums, was not named in the policies, was not assigned to the policies and did not have privity of contract with the insurance companies. *Red Arrow Prods. Co., Inc. v. Employers Ins. of Wausau*, 607 N.W.2d 294, 303 (Wis. Ct. App. 2000). The *Red Arrow* Court also dismissed the argument that the policies may transfer as a matter of law because that theory is based in part on California's and Washington's rule of product-line successor liability – a rule that Wisconsin rejected. *Id.* at 300-01. Illinois also declined to follow this rule. *Myers*, 596 N.E.2d at 758. Nevertheless, other courts have found that insurance policies transfer to a company which acquired the assets of another company. *Citicorp Indust. Credit, Inc. v. Fed. Ins. Co.*, 672 F. Supp. 1105, 1106-08 (N.D. Ill. 1987) (applying Missouri law and finding that "an assignment made by the insured after the event has occurred on which liability under an insurance policy is predicated does not violate a policy provision prohibiting assignment of the policy or its benefits"); *Gopher Oil Co. v. Am. Hardware Mut. Ins. Co.*, 588 N.W.2d 756, 763 (Minn. Ct. App. 1999) (explaining that a non-assignment clause protects the insurance companies from an increased risk it contracted to insure, but that when events that may cause liability have already occurred, a change in the insured's identity does not increase the insurer's risk). In accord with these principles, we will adjudicate the transfer of the insurance policies from Boots to Knoll as a motion for summary judgment upon further briefing by the parties.

## CONCLUSION

For these reasons, we partially grant Knoll's motion for judgment on the pleadings.
(R. 23-1). We deny Automobile's, (R. 34-1), National Union's, (R. 33-1), and Royal's, (R. 27-1), motions for judgment on the pleadings. Defendant Insurers' briefs on the transferability issue are due on or before July 27, 2001. Knoll's response is due on or before August 10, 2001.

**ENTERED**:

**Judge Ruben Castillo**
**United States District Court**

**Dated:  July 13, 2001**

21